IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No.  04-cv-01961-LTB-CBS

SANFORD LEE HERTZ,

Plaintiff and Counterclaim Defendant,

v.

LUZENAC AMERICA, INC., a Colorado corporation, and
THE LUZENAC GROUP, a French corporation,

Defendants.

AND

LUZENAC AMERICA, INC., a Colorado corporation,

Counterclaim Plaintiff,

v.

LANE LIGHTHART, an individual,

Third Party Defendant and Counterclaim Plaintiff,

v.

LUZENAC AMERICA, INC., a Colorado corporation,

Third Party Defendant.

_____

## ORDER

_____

Sanford Lee Hertz and Lane Lighthart move for summary judgment on all of the claims –

interference with prospective business relationship; interference with contractual relationship;

misappropriation of trade secrets; conversion of proprietary information; civil theft, Colo. Rev. Stat. § 18-4-405; breach of contract; unjust enrichment; and conspiracy – that Luzenac America, Inc. ("Luzenac") asserts against them.  Luzenac moves for summary judgment against Messrs. Hertz and Lighthart, seeking dismissal of Mr. Hertz's claims for retaliation in violation of Title VII of the Civil Rights Act of 1964, interference with prospective business relationship, interference with contractual relationship, and defamation *per se*, and Mr. Lighthart's claims for Title VII retaliation, interference with prospective business relationship and interference with contractual relationship.  I find and conclude from the voluminous materials submitted by the parties on the motions that, unless otherwise noted, the facts recited in this order are not subject to genuine dispute.

The motions are adequately briefed and oral argument would not materially aid their resolution.  For the reasons stated below, I GRANT in part and DENY in part Messrs. Hertz's and Lighthart's motion and GRANT in part and DENY in part Luzenac's motion.

## I.  Hertz's and Lighthart's motion for summary judgment

### A.      History

By the combination of various methods, Luzenac succeeded in 1992 or 1993 at developing a line of silane-coated talc, called "Mistron," which it sold to sundry industries for incorporation into substances such as rubber and plastics.  Oscar Noel, a Luzenac scientist, championed the development of the Mistron products.  With the assistance of colleagues, Mr. Noel considered the operative variables, which were the type of vinyl silane to use; the optimal concentration of silane; the configuration and type of the mixing device; the amount of time spent mixing the product; and the surface area, particle size, and "Hegman loose bulk density" of the

talc ore.  Other considerations presented themselves during the development process, including how to store and package the product and how to test its fluidity, a desirable trait.

Luzenac, its predecessor, Cyprus, for whom Mr. Noel also worked, and competitors had been applying silane to talc before Mr. Noel began work on the Mistron products.  However, Mr. Noel considers himself the inventor of vinyl silane-treated talc.  After experimentation with different application methods, Mr. Noel settled upon spraying the silane into a high-speed chopping machine, known as a Littleford mixer, full of talc.  Later, Luzenac used two other, similar machines.  Mr. Noel cannot remember how he attained the idea to spray the silane; "it seemed to be the right thing to do, that is, to try to get some type of distribution of the silane on the product prior to mixing it."

In August, 1994, Luzenac hired Mr. Hertz to direct the technical aspects of developing and marketing a Mistron product for the paints and coatings industry.  (Mr. Noel does not venture in that field and is not expert on the subject.)  Manufacturers of coatings frequently employ talc and other minerals in production as filler material and mineral pigment.  Minerals coated with vinyl silane have proved most efficacious.  Mr. Hertz was at that time intimate with the coatings consort.  As a senior chemist for Sherwin-Williams Company, a paint manufacturer, he had evaluated new coatings technologies.  Later, as manager of one of Sherwin-Williams brands, he had familiarized himself with all of the major paint and coatings companies in North America and their products.  Just prior to joining Luzenac, he served Wacker Silicones Corporation, a silane and silicones producer, overseeing technical support of Wacker's sales efforts toward the coatings industry.  By the time he arrived at Luzenac, he knew all of Luzenac's potential customers in the coatings industry.  He also brought with him knowledge of the methods by which silane is

commonly applied to talc.  Mr. Hertz recommended adaptations to an existing Mistron product, which resulted in Mistron 604AV.  He then recommended prospective customers for the product, which Luzenac pursued.

Shortly after hiring Mr. Hertz, Luzenac hired Mr. Lighthart, whose job consisted of marketing and selling Mistron 604AV to companies within the coatings industry.  Both Messrs. Hertz and Lighthart signed agreements that provided, *inter alia*,

> In consideration of employment with Luzenac America, Inc., you agree that during and after your employment with Luzenac America, you will not divulge or appropriate to your own use or to the use of others any secret or confidential information or knowledge obtained by you during employment with Luzenac America.  This restriction shall not apply to information which is or becomes part of the public domain through no breach of any obligation or confidentiality, or was known or possessed by you prior to beginning employment with Luzenac America.

At that time, Luzenac propagated a code of conduct, which provided, *inter alia*,

> The use of inside information obtained by officers and employees for personal advantage is prohibited.  An officer or employee may not use for personal benefit any material corporate information prior to its public disclosure.

> Any officer or employee, during and after their employment with Luzenac America or any subsidiary or affiliated corporation, may not divulge or appropriate to their own use or to the use of others, except as authorized or directed by Luzenac America, any secret or confidential information or knowledge obtained during employment.  This restriction shall not apply to information which is or becomes part of the public domain through no breach of any obligation of confidentiality, or was known or possessed by employee prior to entering employment with Luzenac America.

Neither the parties' letter agreements nor the conduct policy define the terms "secret or confidential information."  Indeed, these terms find no meaningful definition anywhere in the record.

For 604AV, Mr. Hertz and his associates chose a talc with a Hegman grind of 6.0 and determined that 0.5% silane concentration was optimal.  Mr. Hertz tested various levels of silane

4

concentration and sent samples – at 0.25%, 1.0%, and 2.0% – to potential customers.  Mr. Noel explained that these determinations had to be made for 604AV independent of his own findings for the other Mistron products because paint and coatings customers had needs distinct from rubber and polymer manufacturers.

In a May 15, 1995 memorandum to the Luzenac sales department introducing Mistron 604AV, Mr. Hertz wrote, "Mistron 604AV is manufactured using a unique proprietary process that ensures uniformity of the surface treatment."  The memorandum provides the list price – $0.45 per pound – and the Hegman grind – 6.0 – of the new product.  Mr. Hertz promised that distribution of samples and a technical data sheet would commence presently.  Throughout progression of the project, Mr. Hertz marked some of his communications as confidential; others he did not mark.

In a May 24, 1995 memorandum, Jerry Gauntt of Luzenac's sales department informed Luzenac's distributers of the progress with the Mistron line, then numbering three distinct products – Mistron PXL, Mistron X, and Mistron 604AV.  He explained that Mistron PXL used a 5.5 Hegman grind and that Mistron X used a 6.0 Hegman grind and gave prices for the products.  He wrote, "Mistron PXL has also been sampled into such coating applications as gel coats.  To differentiate the product, Lee Hertz has developed Mistron 604AV... for the coatings industry."

By April, 1996, Mistron 604AV was meeting success in an expanding coatings market.  One customer in particular, Ferro Corporation, made steady demand.  However, Luzenac did not have a monopoly.  In an April 8, 1996 memorandum to Mr. Gauntt, Mr. Lighthart estimated that the potential market for 604AV exceeded two million dollars.  He also noted,

As everyone is aware both MTI and Polar have come out with competing surface treated talc's (sic), which are under evaluation at several gelcoat manufacturer's (sic).  However, there is no evidence at this time to indicate any knowledge or an awareness, in either case, of the unique properties such a product brings to this additional and, for the most part, nontraditional talc market.

In circumstances not relevant here, Luzenac fired Mr. Hertz in January, 1998.  A lawsuit ensued, resulting in a jury verdict for Luzenac on Mr. Hertz's claim of discrimination and a verdict for Mr. Hertz on his claim against Luzenac for retaliation in violation of Title VII.

In 2000, Luzenac stopped manufacturing Mistron 604AV.  Since 2001, Van Horn Metz, Inc. ("VHM") has by agreement with Luzenac manufactured 604AV under the name VHM 604AV.  VHM has a license from Luzenac and has agreed to purchase the requisite talc ore from Luzenac.  It has assigned to Luzenac its claims against Messrs. Hertz and Lighthart.  The troublesome circumstances of this assignment are noted below.  Though VHM did not agree particularly to keep the process for 604AV confidential, it continued to labor pursuant to a general confidentiality provision contained in a distributorship agreement that it and Luzenac had executed in June, 1993.

Dr. Ed McCarthy supervised Cyprus' pilot plant in Alpine, Alabama, where Mistron 604AV was first produced, and later directed technical operations in Cyprus' lab in Denver.  At the time Luzenac developed Mistron 604AV, Dr. McCarthy was a senior scientist for Luzenac.  In November, 2002, Dr. McCarthy prepared for VHM a memorandum describing the process for producing and testing 604AV; he was unable to locate in Luzenac's facilities any document containing the pertinent information and had to create one himself.

Barrett Fisher, supervisor of sales and finance for VHM, testified that VHM pays an entity called R.J. Marshall to produce 604AV for it.  In 2002, VHM and R.J. Marshall entered into a

confidentiality agreement, by which R.J. Marshall is prohibited from using proprietary information imparted to it and from selling treated talc.  VHM employees sign a confidentiality agreement when they commence employment with VHM.  That agreement covers, among other things, customer lists.  Also, VHM's employee handbook designates customer lists as confidential.

Mr. Fisher testified that development of customers for 604AV required "a lot of time, a lot of phone calls, and a long-term relationship. ... So the customers trust us and we develop the relationship."  Similarly, Mr. Gauntt of Luzenac testified that he obtained information about prospective customers from publicly-available sources – internet web sites, material safety data sheets, trade journals – then built relationships with those potential customers in order to gain access to persons authorized to make purchasing decisions.  A manufacturer of mineral-based products can obtain customer information without misappropriating it, but will need weeks or months to develop the relationships necessary to make sales.

In February, 2002, Mr. Hertz communicated with IMI Fabi, LLC, a competitor of Luzenac, about the development of a product to compete with VHM 604AV, called "Genera."  In April, 2002, Mr. Hertz's consulting company, Sanford Hertz & Associates ("SHA") and IMI Fabi agreed by writing to mutual secrecy concerning production and sale of Genera.  In July, 2002, SHA and IMI Fabi executed a consulting agreement.  Presently, Mr. Lighthart, who had left Luzenac when it stopped manufacturing Mistron 604AV, agreed to assist SHA's efforts to find customers for Genera.  He contracted with SHA and was promised a portion of the earnings Mr. Hertz expected to recognize from IMI Fabi's sales of Genera.

Mr. Lighthart supplied to Mr. Hertz a five-page document listing potential customers for Genera, contact persons at each target, and the application in which each prospect was likely to

use Genera.  Mr. Lighthart had compiled the information in part from his contacts with Luzenac customers and prospective customers and in part from public sources.  The document discloses the projected quantities of Mistron 604AV that Lighthart anticipated Luzenac's customers and potential customers might purchase.  In the document, Lighthart identified Luzenac's three customers, among others, as Genera prospects.  Mr. Hertz forwarded the document by email to Scott Baker of IMI Fabi.  The document is not marked as confidential.

On August 16, 2002, Mr. Hertz sent an email to IMI Fabi representatives explaining the advantages of marketing a vinyl-silane treated talc to the gelcoat industry, the volume demands of the largest consumer, the price that Luzenac was most recently charging for 604AV, and the benefit that end users of gel coats – boat owners – derive from coating their vessels with derivatives of treated talc.  He explained that he and his "associates" (in other communications he referred to Mr. Lighthart as his "associate") had derived this information from "good contacts and relationships with many facets of the coatings and composite industries.  Over the years we have gained the trust of many R&D organizations.  Our customers have included Sherwin-Williams, PPG, Valspar, XIM, 3M, and many others."  Mr. Hertz labeled the email a "Confidential Document."

In the ensuing months, Mr. Hertz advised IMI Fabi in the development of Genera.  IMI Fabi employed for the purpose spray and mixing equipment that it had previously used to treat talc with liquids other than silane.  IMI Fabi's mixer differed from the high-speed chopping machines that Luzenac had used to manufacture Mistron, but accomplished the same effect, namely dispersal of talc through a mist of sprayed liquid, which coated the talc particles as they passed through it.  Mr. Hertz testified that IMI Fabi's production process is similar to one used at

Wacker during his tenure there, prior to his employment with Luzenac.  He also shared with IMI Fabi the same information about the production of Mistron 604AV that he had disclosed to Luzenac's customers in furtherance of his marketing efforts for Luzenac.

In an August 22, 2002 email to Mr. Baker, Mr. Hertz recommended use of a 6 Hegman grind talc and undiluted silane, silane concentrations between 0.5% and 0.75%, and a mixing time of between twenty and thirty minutes.  Mr. Hertz and IMI Fabi then experimented with various silane concentrations – 0.5% and 0.75% – and mixing times – thirty minutes and sixty minutes – and submitted samples to potential customers for comparison.  Based upon reviews of the samples, IMI Fabi settled upon a 0.5% concentration and a thirty-minute mixing time.  (It later shortened the mixing time to fifteen minutes.)  Upon Mr. Hertz's recommendation, IMI Fabi stored the finished product for two weeks after mixing in order to allow ethanol, a by-product of the mixing process, to dissipate before shipping.  IMI Fabi workers were able to smell the ethanol as production progressed.

In 2002, Ferro, which had continued to purchase 604AV from VHM after Luzenac discontinued its operation, began to look for an alternative product because VHM 604AV was not performing up to Ferro's expectations.  At around this time, Mr. Lighthart approached David Carpenter of Ferro, offering to sell him IMI Fabi's Genera product.  Neither Mr. Lighthart nor Mr. Hertz disparaged VHM's offering to Mr. Carpenter.  Mr. Carpenter informed Mr. Lighthart of the deficiency of VHM 604AV and agreed to test Genera against 604AV.  Ferro also tested a product from another of Luzenac's competitors, Canada Talc.  Ferro chose Genera and began purchasing it.

In May, 2003, Mr. Hertz wrote to the purchasing manager, Kay Lake, at Sheboygan Paint, which formerly had purchased 604AV from a Luzenac distributer, extolling the virtues of Genera. He opened,

> It has been called to my attention that Sheboygan Paint may need to conduct evaluations of the IMI Fabi Genera VS160A, to replace the retired Luzenac America product Mistron 604AV.  As the inventor of both products, I am uniquely qualified to present the following technical information and history.

He went on to describe both products.  About Mistron he opined,

> It was produced on extremely crude equipment that could not ensure the uniform surface modification that is required for most coatings applications.  As time progressed, a marginally effective process was developed at a Luzenac plant in Alpine, Alabama.  After this process was deemed unacceptable, an improved apparatus that enhanced the product was constructed in Grand Island, Nebraska.  Upon the closing of Luzenac's Grand Island facility, production was again moved.  This time to a toll manufacturer that developed yet a third process.  Soon after this transfer to outsourced production, Luzenac discontinued the product.  Since being discontinued, a distributer has been allowed to have the material toll produced at unspecified locations with unknown production methods.

Unfavorable comparisons of Mistron to Genera followed.

Presently, Sheboygan began to purchase Genera from IMI Fabi.  Sheboygan informed Mr. Fisher of VHM that IMI Fabi packaged its product in containers more suitable to its needs than those VHM provided.

### B.      Elements of the process

Dr. Roy Hauser, Luzenac's proferred expert, opined by written report that production of the Mistron product line was predicated upon nine distinct trade secrets.  I consider each in turn.

#### 1.      Finely-ground talc

Luzenac used as the base for Mistron 604AV a talc ore of Hegman 6.0 grind.  Luzenac purports to disagree, but has provided no evidence to dispute, that Mr. Hertz recommended the

Hegman 6.0 grind and that the product from which 604AV was derived, Mistron PXL, used a Hegman 5.5 grind, as Mr. Gauntt wrote in 1995.  Mr. Noel, the Luzenac scientist, testified that Luzenac informed Ferro of the Hegman grind of 604AV and, significantly, that Ferro was free to share that information with others.  Also, as noted below, the Hegman grind of the Mistron products appears in various advertisements and technical documents that Luzenac distributed.

### 2. VTEO silane

Dr. Hauser asserts that Luzenac's use of vinyl triethoxy silane ("VTEO") as a coupling agent on the talc is a trade secret.  Luzenac's Dr. McCarthy testified that vinyl silane exists in four or five types.  Though Mr. Noel asserts that twenty-five different types of silane exist, he concedes that use of VTEO silane to coat minerals is not a secret.  Dr. Hauser identifies 26 types of coupling agents but only two types of vinyl silane – VTEO and vinyl trimethoxy silane ("VTMEO").

Luzenac disputes neither that VTEO is one of only two vinyl silanes commonly used commercially nor that VTMEO silane produces methyl alcohol, which is highly toxic, and is therefore not a practicable choice.  Luzenac also does not dispute that this distinction is common knowledge to those, like Mr. Hertz, who possess an elementary understanding of chemistry.  Indeed, Mr. Noel stated in an October, 1995 letter that Luzenac's silane supplier had recommended switching from VTMEO to VTEO because the Occupational Safety and Health Administration had proposed limits on exposure to methylethanol.  Dr. Hauser and Dr. McCarthy concurred that Luzenac had abandoned use of VTMEO in response to "toxicity concerns" and "health issues," respectively.

Although Mr. Gauntt testified that Luzenac's policy was to refuse to inform customers that 604AV was treated with vinyl silane, an advertisement that Luzenac published to prospective customers in trade journals and at trade exhibitions states, "Mistron 604AV – a platy, vinyl silane treated, 6 Hegman talc – improves corrosion resistance, eliminates hard settings, improves adhesion, and provides excellent barrier properties." A Luzenac product list includes "Mistron 604 AV (Vinyl Silane)" and identifies the product's Hegman grind as 6.0. Other advertisements and technical bulletins disclosed that the talc was treated with an organosilane coupling agent. Mr. Hertz testified that his practice at Luzenac was to inform customers that Luzenac treated the product with vinyl silane. David Carpenter of Ferro recalled in deposition that 604AV was treated with "some type of silane."

After assuming responsibility for 604AV, VHM also informed prospective customers that it treated the product with vinyl silane. Mr. Fisher testified that this practice was necessary in order to distinguish 604AV from other silane-treated talcs. And nothing in the record indicates that Luzenac has asserted claims against VHM for violation of its confidentiality agreement.

### 3.  0.5% concentration of silane

Dr. Hauser asserts that the 0.5% concentration of silane in 604AV is a trade secret. However, since 2003, after VHM began losing business to IMI Fabi, it has applied 0.6% silane to its 604AV in order to attain better performance. In either event, the concentrations used by Luzenac and VHM appear in publicly-available documents. Shin-Etsu, a silane manufacturer, recommends to customers in a published document the application of silane in concentrations of between 0.5% and 1.0%. A July 1, 1995 technical data sheet, which Mr. Kollmar, formerly Luzenac's manager of marketing, distributed to potential customers on Luzenac's behalf,

discloses that the concentration of "organosilane (proprietary)" is less than one per cent. Todd Yonker, formerly Luzenac's Technical Manager of Paint and Coatings, wrote to a Luzenac customer on September 18, 1996 that the standard silane concentration for Mistron 604AV was 0.5%.

Both Mr. Noel and Dr. McCarthy testified that most authorities do not, in fact, recommend the concentrations Luzenac and VHM have used; following publicly-available formulae would result in a three per cent concentration of vinyl silane in 604AV. However, they did not distinguish the Shin-Etsu recommendation. Nor do they claim to have experimented with 3% concentration levels. By experimentation and experience, they ascertained that a 0.5% concentration was optimal for Mistron. After testing, Mr. Noel determined that a concentration of 0.5% silane is as effective as a 1.0% concentration and, because it is more cost-effective, he employed that formula. Luzenac does not dispute that Mr. Hertz similarly experimented with concentrations of between one half and one per cent while developing both Mistron 604AV and Genera, and let prospective customers decide what concentration worked best.

### 4.    Dispersion of talc as a cloud in batch

Dr. Hauser stated in his report that the effect of Luzenac's mixing machines, namely the agitation of a batch of talc powder into a cloud, is a trade secret. However, Dr. McCarthy conceded in deposition that the dispersal of the talc in the mixing machine was neither unique nor proprietary to Luzenac, but rather a function of the operation of the high-speed chopping action of the Littleford machine, which is commonly used in the industry.

Luzenac does not dispute that Littleford Day, the machine manufacturer, recommended the mixing process to it after testing in Littleford Day's plant. Nor does Luzenac dispute that IMI

Fabi used a cloud-dispersal method to spray liquids on to talc powder before it began to manufacture Genera. And Dr. Hauser conceded in deposition that mixers of the type used by Luzenac to create the clouds of talc are commercially available and commonly used throughout the industry.

### 5.  Undiluted silane

Dr. Hauser opined that Luzenac's use of neat silane (not diluted) is a trade secret. He acknowledged that publicly-available authorities discuss this option, but nevertheless asserted that the practice is a trade secret because "it is a preferred method." He did not further explain this conception of trade secrets.

In its trade publication, Shin-Etsu recommends for treatment of powders the introduction of neat silane into a high-speed mixer. Shin-Etsu calls this practice the "dry method," and states that it is difficult but "widely used in (sic) industry because it enables the treatment of a large amount of filler in a relatively short time." Luzenac has provided nothing to contradict this evidence.

### 6.  Application of silane as mist

Dr. Hauser conceded that spraying silane onto talc is not a trade secret. However, he opined that spraying the silane in a "fine mist" is proprietary to Luzenac. He neglected to define the phrase; neither Dr. Hauser nor Mr. Noel could identify the sizes of the nozzles Luzenac used to spray the silane or the size of the mist droplets. Dr. Hauser testified that he was not aware of anyone having measured the particle size of the mist. And he conceded that IMI Fabi had sprayed chemicals other than silane in "fine sprays" onto talc before it developed Genera.

The record demonstrates that Luzenac obtained the misting practice from the public domain. In January, 1995, Mr. Noel presented to Dr. McCarthy an article published by Huls America, a silane manufacturer. He suggested by memorandum that Luzenac should consider Huls' recommendation, contained in the article, that the coupling agent (silane, in this instance) be "atomized" in order to "minimize the droplet size."

### 7.    20 - 30 minute mixing time

In his report, Dr. Hauser asserted that a twenty- to thirty-minute mixing time, conspicuously coincident with Mr. Hertz's recommendation to IMI Fabi, was proprietary to Luzenac. In deposition, Dr. Hauser could not "say for sure" what mixing time Luzenac had used or what amount of time constituted a trade secret. Mr. Noel and Dr. Hauser both testified that the mixing time depended upon the equipment used. Mr. Noel stated that Luzenac used three different machines over the life of the Mistron project, which ran for thirty minutes, three minutes, and five minutes, respectively, per batch. Dr. McCarthy testified that the material must mix for thirty minutes to attain a complete reaction. In one draft of his November, 2002 memorandum to VHM, Dr. McCarthy specified a thirty-minute mixing time; in the final draft he instructed that batches mix for eight minutes. After reviewing these documents, Dr. Hauser ultimately concluded that mixing time is not "a critical part of" Luzenac's purported trade secret.

### 8.    Testing by use of the Scott volumeter

Luzenac used a device called a "Scott volumeter" to test the quality of Mistron 604AV after production. The device, which Luzenac neither invented nor constructed, previously served a different purpose, namely measuring the bulk density of talc powder. Talc was filtered through the machine into a cube, in which the mass of the powder could be measured. An attendant

would repeatedly tap the volumeter with a spatula in order to encourage the material to navigate its intended course.  This activity is widely practiced in the industry.

The allegedly proprietary practice had its genesis when a staff member at one of Luzenac's plants, Bob Cooner, observed that properly-treated talc flowed freely through the volumeter and that this fluidity could be quantified by recording the number of taps required to instigate the flow. Some Luzenac personnel named the method the "gonkulator test," though Mr. Hertz never heard that name used.  Dr. McCarthy is not aware of any similar test in the industry and asserts that, though the method by which the machine is used is the same for both the secret and non-secret tests, the purposes of the tests are distinct.

Mr. Noel testified that untreated talc flows through the volumeter after twelve to fourteen taps, while fluid talc will flow through with two to three taps.  Dr. McCarthy testified that eight to ten taps are required to instigate untreated talc, while two to four will move treated talc.  In his November, 2002 memorandum to VHM, Dr. McCarthy wrote, "There are no really simple procedures to determine the level of silane on the talc."  He described some possible measurements, then went on, "It is also possible to get a qualitative measure of coating efficiency by running a loose bulk density procedure on the coated product with a Scott Volumeter.  With the base talc, it will take 8-10 taps to get the talc to fill the tube.  With VTEO treated talc it will take 2-4 taps."

Though Luzenac concedes that the fluidity of treated talc is readily-observable, Mr. Noel characterized the knowledge that treated talc is "highly fluid" and flows freely as "highly confidential."  He asserts by affidavit that very few people, including Luzenac employees observed the gonkulator test and that the test is not demonstrated for persons outside Luzenac and VHM.

16

However, in deposition he could not say whether anyone from Luzenac had informed Ferro, Luzenac's primary customer, about the test.

Mr. Yonker by affidavit averred that in the course of his work for Luzenac he described the Scott fluidity test to customers and potential customers. No one at Luzenac instructed Mr. Yonker to keep the test secret. To the contrary, Luzenac commonly disclosed its quality control methods to customers and potential customers. Mr. Yonker was bound to Luzenac by the same agreement as Messrs. Hertz and Lighthart, which did not define the operative terms "secret or confidential information."

### 9.    Storing for two weeks before sale

Dr. Hauser testified that Luzenac stored mixed Mistron for two weeks before sale in order to enable "further migration of the silane over the surface of the talc." Mr. Noel testified that he obtained from the treatise of an esteemed expert, Edwin Plueddeman, the idea to give the silane some time to migrate after treatment. The practice proved not to be effective. In an April, 2003 email to Mr. Fisher, Dr. McCarthy wrote, "We (Luzenac) have no data that indicates that silane effectiveness improves if the product is allowed to stand." Also, Dr. Hauser was unable in deposition to cite any evidence that storage improves the effectiveness of the product.

Dr. Hauser conceded that allowing ethanol by-product to disperse from the product before shipping was a safe business practice, and he did not dispute that IMI Fabi personnel were able to smell the ethanol during production of Genera. He allowed that shipping the product before allowing the ethanol to disperse could cause an explosion.

### C.    General attempts at secrecy

Dr. McCarthy considers Luzenac's manufacturing processes proprietary and expects

customers to whom that information is imparted to keep it secret.  Though he has the impression that Luzenac routinely enters into confidentiality agreements with customers, no such agreements appear in the record, which consists of thousands of pages of exhibits and deposition transcripts. Nothing in the record indicates that Luzenac had confidentiality agreements with the customers who purchased 604AV.  Dr. McCarthy understands some aspects of the Mistron 604AV manufacturing process – application of vinyl silane to a mineral, applying the silane without diluting it first – to be described in the public domain, but believes that the combination is proprietary to Luzenac.

Dr. McCarthy testified that Luzenac tells its employees, when they are first hired and subsequently in staff meetings, to keep "everything" confidential.  He concedes that employees must with some frequency violate this ostensible prohibition – sales personnel, for example, share information about products with customers.  Luzenac leaves to the subjective judgment of its employees the question what information is appropriate for disclosure.  Those employees who guess wrongly "tend not to be around very long."  Mr. Yonker testified that he was required during his tenure at Luzenac to determine for himself what information was confidential.

Mr. Gauntt testified that confidential information was identified to sales personnel through coaching, but could not remember which sales persons were coached.  He recalled having seen one or two internal memoranda, not in the record here, designating information about 604AV as confidential.  He claimed that he would have fired anyone he caught disclosing that Mistron is treated with vinyl silane.  However, he conceded that no one at Luzenac ever defined the phrase "secret or confidential information," and that he arrived at his own definition through experience and "common sense."

Luzenac has no system of which Dr. McCarthy or Mr. Gauntt is aware of marking confidential documents, except personnel files.  Though it occasionally marks as confidential documents presented to customers, it generally does not do so for internal documents.  Luzenac uses a confidentiality agreement with some, but not all, customers.  (Again, none appear in the record.)  Mr. Hertz testified that several temporary employees, none of whom signed confidentiality agreements, provided clerical assistance to him during his work on Mistron 604AV and had access to information concerning customers, processes, and testing.  Luzenac's European division, according to Dr. McCarthy, "had a more formal system of regulating confidentiality."

To Dr. McCarthy's knowledge, only personnel files are stored under lock and documents containing "trade secrets" are stored in no particular location.  Mr. Yonker testified that documents other than personnel files were stored unlocked until late 1999 or early 2000 (Mr. Hertz left Luzenac in January, 1998), after which time Luzenac began to develop a confidentiality policy concerning certain important documents.  He was not aware of any procedures in the technical center for restricting access to confidential information.

In preparation for his deposition, Dr. McCarthy searched without success for a document describing the process for manufacturing Mistron 604AV that might have existed during Mr. Hertz's tenure at Luzenac.  However, he was certain that such a document had at one time existed; he could not otherwise explain how the Luzenac factories had produced the product.  He attributed the disappearance to a dispersion of descriptive documents since the development of the Mistron line.  The records of the plant in which the product had been created are now "archived or destroyed or lost or whatever."  He does not have access to them and cannot account for them.  His own "files were in such a state of disarray that [he] could not find

19

anything." He speculated that some of the "lots and lots of other people involved back then who are no longer with the company" might possess a document describing the process.

Mr. Gauntt testified that Luzenac has no single repository of customer-contact information. Luzenac maintains a database of customers and potential customers, which includes whatever information Luzenac can glean from public information, sales calls, and rumor. All of the information in the database is derived from non-confidential sources. It is printed annually and used to calculate Luzenac's market share to the satisfaction of Luzenac's parent company.

During Mr. Gauntt's tenure, Luzenac stored reports of its sales calls in an unlocked filing cabinet to which "anyone in the office" had access. It also maintained various databases of call reports, in which each sales person had electronic access only to information about his or her own customers. Reports were distributed from those databases to interested persons within Luzenac, usually ten to twenty, depending upon the project. Invoices from Luzenac contained contact information for Luzenac's customers, but did not identify points of contact within the sundry organizations.

Mr. Gauntt testified that Luzenac distributed its price list internally to sales persons, customer service representatives, and manufacturers, and externally to distributers. Sales personnel disclosed prices for products to customers and prospective customers upon request and Mr. Gauntt was aware of no mechanism by which Luzenac could require its customers to keep its prices confidential. Likewise, Dr. McCarthy is not aware of any agreements between Luzenac and its customers requiring them not to divulge the prices of Luzenac products. VHM also shares its prices for VHM 604AV with its potential customers.

20

### D.    Disclosures of the 604AV process

As Luzenac in 1995 redoubled its efforts to market 604AV, it commissioned Michael Lorang to oversee the construction of a production apparatus, which would increase its manufacturing capacity, at a facility in Nebraska.  Mr. Lorang and colleagues designed a mixing machine for that purpose in cooperation with machine manufacturer Littleford Day.  Nothing appears, and Mr. Lorang could not remember anything, to indicate that Luzenac required Littleford Day to keep confidential the specifications imparted to it.

Luzenac made no apparent attempt to conceal the details of the 604AV process from Littleford Day.  It developed the large-scale mixing process in part at one of Littleford Day's plants.  Messrs. Noel and Hertz were among those representing Luzenac at the tests.  Littleford Day ran trials with a 0.5% concentration of VTEO silane for various lengths of time and, at Mr. Hertz's request, at various temperatures.  Jeffrey Raabe of Littleford Day later wrote in a letter to Luzenac several recommendations for the process and noted, "The application is quite unique since you are dispersing a very small amount (0.5%) of Silane liquid into a very fine particle size talc powder."  Mr. Raabe also noted the requisite shear energy and minimum number of chopper blades for the project.  In a written request for authorization of the project, Mr. Lorang noted that Littleford Day had recommended an eight-minute mixing time for one machine and an eleven-minute span for another.

Mr. Lorang by memorandum of December 14, 1995 wrote to colleagues involved in the expansion project.  At Mr. Hertz's suggestion, Mr. Lorang included in his missive an admonition to secrecy.  He wrote, *inter alia*,

The bottom line is that this project is very sensitive and should not be discussed with anyone outside of the company. This includes not only equipment manufacturers, but Silane suppliers as well.

Lee Hertz is working on a confidentiality agreement and supply agreement with a Silane supplier. If he obtains these, we will limit our purchase to one supplier.

The secrecy for which Mr. Lorang hoped was presently abandoned. Mr. Hertz never obtained a confidentiality agreement from a silane supplier because the supplier opined that Luzenac's methodology and technology were not unique. Thereafter, in its zeal to sell 604AV, Luzenac increasingly tendered to potential customers access to information about the product. Mr. Lorang testified that the factory in Alabama, where production of 604AV began, had been closed to all but employees and was adorned with a sign cautioning, "What you see here, stays here." But the new operation in Nebraska had no such sign and was open to visitors. Though those touring the facility did so under the supervision of a manager, and were kept from the machinery itself, they signed no confidentiality agreements. Similarly, outsiders toured Luzenac's laboratories approximately once per month. They also were escorted but not required to agree to any degree of confidentiality.

As noted above, documents that Luzenac released to various members of the public disclosed the Hegman grind, median particle size and surface area of Mistron 604AV, explained that the talc was treated with an organosilane coupling agent, and revealed that the concentration of the organosilane was less than one per cent. When one of Luzenac's competitors, Mineral Technologies, entered the market, Messrs. Hertz and Lighthart assuaged skeptical Luzenac customers by describing to them Luzenac's processes, equipment, and quality-control tests, including the Scott volumeter test, in order to distinguish Mistron 604AV from Mineral

Technologies' offering.  Mr. Gauntt denies by affidavit, submitted with Luzenac's response brief,

any knowledge that Messrs. Hertz and Lighthart were sharing that information, but does not

refute the fact.

Carl Kollmar tendered 604AV at trade shows.  He testified that Luzenac did not attempt

to keep its technical data sheets confidential and, in fact, instructed its personnel to dispense those

documents to anyone who had interest.  Mr. Kollmar agreed with Messrs. Fisher's and Gauntt's

assessment that general information about prospective customers is publicly-available and that a

sales person gleans specific, useful information through his or her relationship with the quarry.

The essential predicate to successful sales attempts is a relationship with the customer, in which

the customer feels free to communicate useful information.

### E.      Discussion

The purpose of a summary judgment motion is to assess whether trial is necessary.  *White

v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  I shall grant summary judgment if the

pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no

genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the

governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505,

91 L. Ed. 2d 202 (1986).  The non-moving party has the burden of showing that there are issues

of material fact to be determined.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548,

91 L. Ed. 2d 265 (1986).  A party seeking summary judgment bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the

pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any,

which it believes demonstrate the absence of genuine issues for trial.  *Id.* at 323;  *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992).  Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.  *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980); Fed. R. Civ. P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves."  *Celotex* at 324.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial.  *Id.* at 323.  The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.  *Liberty Lobby,* 477 U.S. at 250.  However, I should not enter summary judgment if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party.  *Id.* at 252; *Mares* at 494.  Moreover, a court may not consider "evidence" that is merely hearsay or general opinions unsupported by fact.  *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995).

### 1.    Trade secret and breach of contract claims

Messrs. Hertz's and Lighthart's confidentiality obligations to Luzenac coincide with the prevailing authorities defining a trade secret under Colorado law, which the parties agree controls. Thus, I consider Luzenac's contract and trade secret claims together.  Essential to demonstration of both claims is that the information appropriated neither came from nor was published to the public domain, facts that no reasonable juror can find on the record before me.

24

Colorado has adopted the Uniform Trade Secrets Act, which defines a trade secret as

the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

Colo. Rev. Stat. § 7-74-102(4).

The Colorado Court of Appeals stated in *Colorado Supply Co., Inc. v. Stewart*, 797 P.2d 1303, 1306 (Colo. Ct. App. 1990), *reh'g denied*, (1991), *cert. denied*, (1991), that the factors relevant to the identification of a trade secret are:

1) the extent to which the information is known outside the business; 2) the extent to which it is known to those inside the business, *i.e.*, by the employees; 3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; 4) the savings effected and the value to the holder in having the information as against competitors; 5) the amount of effort or money expended in obtaining and developing the information; and 6) the amount of time and expense it would take for others to acquire and duplicate the information.

In addition, though extreme and unduly expensive confidentiality procedures need not be undertaken, the claimant must demonstrate that it has made efforts reasonable under the circumstances to maintain the secrecy of the information. *Id.*

The fifth and sixth *Colorado Supply* factors arguably weigh in Luzenac's favor. Luzenac expended considerable effort and time to develop its Mistron line, and invested further resources in Mr. Hertz's development of Mistron 604AV. A reasonable jury might determine that Mr. Hertz and IMI Fabi saved time and expense in developing Genera by virtue of the expertise and information Mr. Hertz obtained and discovered during his time at Luzenac. And a reasonable jury might find that, despite the plurality of comparable products competitive to Mistron 604AV,

25

Luzenac's position was unique as a result of the information and expertise it developed.

But secrecy is the *sine qua non* of the claim and there can be no genuine dispute that the process for manufacturing 604AV was not a secret.  As is clear from the above recitation of undisputed facts, Luzenac and VHM have utilized no discreet mixing time, instead adjusting the duration of each batch mix according to the equipment employed.  Each of the other eight process elements Dr. Hauser identified as trade secrets was either obtained from the public domain – dispersion of talc as a cloud, use of undiluted silane, application of silane as a fine mist, storage for two weeks before sale – or disseminated in the public domain – use of Hegman 6.0 grind, testing by the Scott volumeter – or both – use of VTEO silane, use of 0.5% and 0.6% silane concentrations.  *Compare*, *Religious Technology Center v. F.A.C.T.NET, Inc.*, 901 F. Supp. 1519, 1527 (D. Colo. 1995).

Nor does the process as a whole constitute a trade secret.  Each and all of the elements of the process for manufacturing 604AV are known outside Luzenac.  *Colorado Supply*, 797 P.2d at 1306-1307; *Religious Technology Center*, 901 F. Supp. at 1527.  And Luzenac refrained from any reasonable efforts to guard the secrecy of its process.  *Id*; *Nutting v. RAM Southwest, Inc.*, 106 F. Supp. 2d 1121, 1126 (D. Colo. 2000).  The record demonstrates beyond dispute that Luzenac shared the process with its distributors, with temporary employees, with Littleford Day, with customers, with potential customers, in trade journals, and at trade expositions.  Rather than refuting its silane supplier's assertion that the process was not proprietary, Luzenac declined to demand a confidentiality agreement.  It also refrained from obtaining confidentiality agreements from Littleford Day and its own customers.  When it discontinued the Mistron product line, Luzenac neglected the documents describing the production process, for which it cannot now

account.  It took no action to prevent VHM from sharing information about the treatment of

VHM 604AV.  Indeed, neither Luzenac nor VHM treated information concerning 604AV

confidentially until VHM learned in 2003 of IMI Fabi's success selling Genera.

The few superficial measures Luzenac undertook to maintain confidentiality within its

walls were not reasonably constructed to stem the flow of information to the outside world.  Dr.

McCarthy testified with certitude in deposition that documents describing the process were

disseminated among employees and speculated that those documents had since migrated out of

the company.  At the time of Messrs. Hertz's and Lighthart's employment, Luzenac had no policy

for maintaining the confidentiality of critical documents and no physical mechanism by which to

insulate such documents from the general flow of paper or to impede access to the documents'

contents.

It appears that Mr. Noel and Dr. McCarthy thought that the process for manufacturing

Mistron 604AV was confidential.  Some evidence indicates that Mr. Hertz at one time intended to

keep the development project secret from suppliers and equipment providers.  However, the

question is neither what Mr. Noel and Dr. McCarthy thought nor what Mr. Hertz intended but

rather what Luzenac did.  The record demonstrates that Luzenac did not impart to its employees a

standard by which they might reach the conclusion shared by Mr. Noel and Dr. McCarthy.  Dr.

McCarthy testified that Luzenac instructed its employees to keep everything confidential, a

patently unworkable admonition.  Mr. Gauntt testified that Luzenac left actual confidentiality

determinations to its employees' "common sense."  Mr. Yonker testified much the same.  The

undisputed evidence is that employees exercised subjective judgment by sharing information about

604AV with potential customers.  Luzenac, presumably benefitting from those decisions, took no

adverse action.

This case is thus unlike *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823 (10th Cir. 1993); *Rivendell Forest Products, Ltd. v. Georgia-Pacific Corp.*, 28 F.3d 1042 (10th Cir. 1994), *reh'g denied*, (1994); and *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125 (10th Cir. 2003).  In *Harvey Barnett* and *Gates Rubber*, evidence appeared in the record that the claimant had taken reasonable measures to maintain the secrecy of its proprietary information.  *Harvey Barnett*, 338 F.3d at 1132; *Gates Rubber*, 9 F.3d at 848.  And the court in *Rivendell* expressly declined to opine on the question whether the plaintiff had taken steps to guard secrecy. *Rivendell*, 28 F.3d at 1046.

Luzenac has failed to identify any confidential customer information that Messrs. Hertz and Lighthart allegedly misappropriated.  Though Luzenac claims that the identities of its customers were trade secrets, its witnesses testified that they identified prospective customers from publicly-available sources.  *Colorado Supply*, 797 P.2d at 1306; *Lasermaster Corp. v. Sentinel Imaging, a Div. of Sentinel Business Systems, Inc.*, 931 F. Supp. 628, 638  (D. Minn. 1996).  Luzenac did not require its customers to keep its relationships with them confidential. Luzenac does not dispute that Mr. Hertz knew all of its prospective customers in the coatings industry before he began employment with Luzenac.  And it is undisputed that Luzenac revealed the identities of its customers in invoices and other billing and accounting documents.  *Jet Spray Cooler, Inc. v. Crampton*, 282 N.E.2d 921, 926 (Mass. 1972).  Consistent with the evidence that Luzenac instructed its employees to keep all information confidential, some employees testified, after-the-fact, that they knew all customer and pricing information to be confidential.  However, this impracticable, blanket prohibition does not constitute a reasonable attempt at secrecy and the

28

evidence is undisputed that Luzenac employees ignored it of necessity.

Luzenac argues that the quantities of Mistron that its customers purchased was proprietary. However, no evidence indicates that Messrs. Hertz and Lighthart appropriated that information; Mr. Lighthart testified that his projections of potential sales of Genera were based upon "blue sky" estimates and contact with individual prospectives, with whom he had continuing relationships. *See*, *Smith Oil Corp. v. Viking Chemical Co.*, 468 N.E. 2d 797, 800-801 (Ill. App. Ct. 1984). Luzenac also argues that its pricing information was confidential. However, it is undisputed that Luzenac made no efforts to restrain its customers from disclosing to competitors the prices they paid and nothing in the record indicates that IMI Fabi obtained pricing information from Luzenac, rather than Luzenac's customers. *Smith Oil*, 468 N.E. 2d at 800-801.

Luzenac's witnesses agreed that the identities and activities of its customers was publicly-available information, and that the relationship between a sales person and the customer provides the competitive advantage requisite to successful sales efforts. It faults Mr. Lighthart for taking with him personal knowledge of persons authorized within its corporate customers to make purchasing decisions. Thus, stripped of detritus, Luzenac's argument is that Messrs. Hertz's and Lighthart's relationships with customers constituted confidential information, which they were prohibited from exploiting. Indeed, in its brief Luzenac explicitly faults Messrs. Hertz and Lighthart for capitalizing upon Mr. Lighthart's relationships with customers of products similar to Genera in order to expedite the commercialization of Genera. Not only does this novel argument find no support in law, it bears the countenance of a forbidden attempt to prevent Messrs. Hertz and Lighthart from competing against Luzenac. *Compare*, *Capsonic Group v. Swick*, 537 N.E.2d 1378, 1384 (Ill. App. Ct. 1989); *Fleming Sales Co., Inc. v. Bailey*, 611 F. Supp. 507, 515 (N.D.

Ill. 1985).

Luzenac's trade secrets and confidentiality claims have at most a superficial appeal.  But close analysis reveals them to be utterly vacuous.  No reasonable jury could find for Luzenac on these claims.

I intermit to note that Luzenac in its 77-page response brief makes several troubling, material, factual claims that are contrary to or unsupported by the record, some of which I address briefly.  Contrary to Luzenac's representation, no evidence appears that Luzenac salespersons were in the practice of designating documents tendered to customers as "confidential."  Dr. McCarthy's testimony, which Luzenac cites for its assertion, is that he had seen a confidential designation on some Luzenac documents, but in relation to patent applications. He testified neither that Luzenac so designated all disclosures to customers nor that it designated any of the information Luzenac accuses Messrs. Hertz and Lighthart of misappropriating.  In fact, the record contains specific instances – Mr. Yonker's September 18, 1996 letter to a customer disclosing the 0.5% silane concentration is an example – of Luzenac personnel disclosing without any confidential designation information that Luzenac now claims is proprietary.

Luzenac asserts that Mr. Lorang specifically discussed the confidentiality of the 604AV project with Hertz.  That purported fact does not appear in the evidence cited, or anywhere else in the record.

Luzenac cites Dr. Hauser's testimony for the claim that a fact issue exists whether it ever published the advertisement describing 604AV as a "a platy, vinyl silane treated, 6 Hegman talc." The testimony cited does not contradict Mr. Hertz's undisputed showing that Luzenac published the advertisement in trade journals and displayed it as a poster at a trade show; Dr. Hauser simply

did not know whether that was true.

Luzenac cites its expert's report for the factual proposition that the public did not have access to the entirety of its manufacturing process. However, the record contradicts that unsubstantiated and unexplained opinion of Dr. Hauser's.

Luzenac asserts that Messrs. Hertz and Lighthart admitted that they knew to keep customer information confidential. However, the actual testimony contradicts Luzenac's characterization of it. Both men testified that some information about customers is confidential and other information is not. Mr. Lighthart further testified that he would not during his employment with Luzenac have assisted a competitor; that he might have acted so disloyally he thought "absurd."

Other misstatements appear in Luzenac's brief. I do not consider arguments premised upon mischaracterizations of the record.

### 2.    Other claims

Messrs. Hertz and Lighthart cite *Powell Products, Inc. v. Marks*, 948 F. Supp. 1469 (D. Colo. 1996) for the argument that the Uniform Trade Secrets Act preempts Luzenac's other claims. In that decision, this Court determined that claims that "are no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation" are preempted. *Id*. at 1474. Luzenac has identified no nuclei of facts underlying its claims for unjust enrichment and conspiracy that can be considered distinct from the facts upon which its misappropriation claim is premised, and those claims must be dismissed.

As to the conversion and civil theft claims, Luzenac has alleged, and Mr. Hertz concedes, that Mr. Hertz took with him certain documents when his employment at Luzenac ended. The

record does not disclose what these documents are, their nature, or their value, if any.  The triable

issue whether Mr. Hertz committed conversion and civil theft will be limited to the circumstances

of his possession of those documents, whatever they are.  *Powell Products*, 948 F. Supp. at 1475.

Mr. Hertz argues that his possession of the documents was not wrongful because he took

them in order to defend himself in his first lawsuit against spurious accusations.  Whatever his

motivation, whether his conduct satisfied the elements of conversion is for the jury to determine.

Luzenac argues that its intentional interference claims are predicated upon

misrepresentations by Messrs. Hertz and Lighthart.  First, it asserts that they informed purchasers

of Mistron 604AV that Luzenac had discontinued the product.  However, the record

demonstrates beyond dispute that those statements were manifestly true.  Luzenac attempts to

obscure this issue by narrating in the passive voice: 604AV is still manufactured by VHM.  This

characterization does not create a factual dispute.

Second, Luzenac argues that Mr. Hertz wrongly disparaged VHM 604AV to customers.

A reasonable jury could conclude that Mr. Hertz's May, 2003 letter to Sheboygan constituted

intentional and wrongful interference with VHM's *prospective* business relations.  *Montgomery

Ward & Co., Inc. v. Andrews*, 736 P.2d 40, 47 (Colo. Ct. App. 1987).  Mr. Hertz claimed in that

letter to have unique knowledge concerning the process for manufacturing 604AV and made

particular factual assertions derogatory of the product.  The claim is not preempted.  *Ethypharm

S.A. France v. Bentley Pharmaceuticals, Inc.*, 388 F. Supp. 2d 426, 433 (D. Del. 2005).

On the other hand, no evidence supports the interference with contract claim because

Luzenac provides no evidence that it or VHM had a contract with Sheboygan.  Mr. Carpenter of

Ferro, from which VHM had an outstanding purchase order, expressly denied that Messrs. Hertz

and Lighthart disparaged 604AV to him.  Any hearsay to the contrary is not competent to create a factual issue for trial.

In sum, Luzenac's claims against Mr. Hertz for conversion, civil theft, and intentional interference with prospective business relations, although thin, survive summary judgment.  The issues at trial will be narrowly confined to Mr. Hertz's possession of documents allegedly belonging to Luzenac and the contents and circumstances of the May, 2003 letter.  Summary judgement shall enter for Messrs. Hertz and Lighthart on all other of Luzenac's claims because no genuine issues of material fact appear and Messrs. Hertz and Lighthart are entitled to judgment as a matter of law.

## II.  Luzenac's motion for summary judgment

### A.      Facts

After attaining success in his prior lawsuit against Luzenac for Title VII retaliation, Mr. Hertz became an object of animosity within Luzenac's organization.  The jury returned its verdict on January 15, 2002 and judgment entered on it.  Thereafter, numerous Luzenac employees expressed in internal communications their disaffection toward Mr. Hertz.  According to Dr. McCarthy, Luzenac employees were angry about the verdict and thought the result unfair; some colleagues "vented" their frustration to Dr. McCarthy.  Dr. McCarthy himself was frustrated that the lawsuit had diverted the attention of Luzenac management from challenges that he considered more pressing.  Other than appealing the verdict (not an adverse action), however, Luzenac in the ensuing months took no action adverse to Mr. Hertz or Mr. Lighthart, who had testified for Mr. Hertz during the January, 2002 trial.  On May 28, 2004, the Tenth Circuit affirmed the judgment of the trial court.

By this time, Luzenac had relinquished to VHM its financial interests in the production and sale of 604AV.  Though it supplied to VHM the ore from which the product was manufactured, its profits from that supply agreement amounted to only $80 per ton.  At the apogee of their commerce in 2003, Luzenac grossed $26,605 in sales of the base talc to VHM.  Previous years saw gross sales of $14,610, $3,196, and $2,767.

For some time after Ferro in 2002 found VHM 604AV wanting and agreed to test Genera, VHM and Luzenac also took no action against IMI Fabi.  In April, 2003, Mr. Fisher of VHM called Dr. McCarthy to relay the purported reports of purchasers that Mr. Hertz was claiming to have invented 604AV and was asserting that VHM was using a different process to manufacture the product than Luzenac had employed.  Mr. Fisher requested that Luzenac attempt to mollify dissatisfied customers.  Dr. McCarthy did not honor that request.  In fact, squabbles over the assertions of competitors were common.  In January, 2001, Mr. Fisher had learned from a customer that a competitor, Polar Minerals, was offering a product purportedly identical to 604AV.  Mr. Fisher informed Luzenac of Polar Minerals' sales tactic.  Neither Luzenac nor VHM took any action against Polar Minerals.

Sentiments within Luzenac toward Mr. Hertz, however, continued to sour.  Strong language appeared in an email exchange among Luzenac personnel concerning the call, described above, from Mr. Fisher, before a Luzenac executive admonished the correspondents to "be very careful what we say in our e-mails."

Based upon Dr. McCarthy's report that Genera was strikingly similar in composition to VHM 604AV, Luzenac determined in July, 2003 to undertake legal measures against Mr. Hertz and IMI Fabi.  On July 31, 2003, a representative of a Luzenac affiliate in Europe emailed the

Chief Executive Officer of IMI Fabi accusing Mr. Hertz of misappropriating trade secrets and threatening to sue IMI Fabi if it continued to affiliate with Mr. Hertz.  On August 5, 2003, Luzenac's counsel sent to Mr. Hertz, his counsel, and IMI Fabi a letter accusing Mr. Hertz of misappropriating Luzenac's proprietary information and threatening legal action.

On August 8, 2003, Mr. Hertz filed suit in state court seeking a declaratory judgment that he had committed no misappropriation.  Luzenac removed here and counterclaimed.  Mr. Hertz amended to add the other claims he now asserts.  On March 31, 2005, after rudimentary discovery, Luzenac moved for leave to add Mr. Lighthart and IMI Fabi as third-party defendants. On August 11, 2005, I dismissed the claims against IMI Fabi for lack of personal jurisdiction.  On September 27, 2005, VHM assigned to Luzenac its claims, as the manufacturer of 604AV, against Messrs. Hertz and Lighthart and IMI Fabi.

I again pause to note a further disturbing irregularity in Luzenac's representations to this Court.  Luzenac alleged in its Answer to Amended Complaint and Amended Counterclaims Joining IMI Fabi, LLC and Lane Lighthart ("Answer") that it then possessed an assignment from VHM of all of VHM's "claims against Hertz, Lighthart and IMI Fabi."  Answer ¶ 7.  Luzenac filed that Answer on June 27, 2005, three months before it acquired the assignment from VHM. In my August 11, 2005 order, consistent with my duty under Rule 12, I took Luzenac's allegation to be true and made reference to the not-yet-existent assignment.

Again, in its briefs, Luzenac has mischaracterized the record in several respects.  For example, it cites Mr. Hertz's deposition in support of its factual claim, which it asserts is undisputed, that Mr. Hertz obtained during the course of his employment knowledge of Luzenac's confidential information and trade secrets.  In fact, Mr. Hertz testified that he was *in a position to*

obtain such information and secrets.  He also testified that he possessed none of Luzenac's

proprietary information and that Luzenac had not taken steps to keep secret the information he

did possess.  Here, as above, I disregard arguments premised upon Luzenac's misrepresentations.

### B.   Title VII retaliation

As claimants, Messrs. Hertz and Lighthart under *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) bear the initial burden of proving by indirect

evidence a *prima facie* case of retaliation under Title VII.  *Kelley v. Goodyear Tire and Rubber

Co.*, 220 F.3d 1174, 1179 (10th Cir. 2000).  In order to establish their claims, they must prove that

(1) they engaged in a protected opposition to discrimination or participated in a proceeding

arising out of the discrimination, (2) Luzenac took an adverse action against them after the

protected activity, and (3) a causal connection exists between their activity and the adverse action.

*Griffith v. State of Colo., Div. of Youth Services*, 17 F.3d 1323, 1331 (10th Cir. 1994).  If they

establish a *prima facie* case, then Luzenac must articulate, and support with some evidence, a

legitimate, nondiscriminatory reason for the adverse action.  *Aramburu v. Boeing Co.*, 112 F.3d

1398, 1403 (10th Cir. 1997).  If Luzenac meets this burden, the claimants must then present

evidence raising a genuine issue that the reason offered by Luzenac is a mere pretext.  *Id*.  At

issue are elements two and three of the *prima facie* case.

Citing *Annett v. University of Kansas*, 371 F.3d 1233 (10th Cir. 2004), *Dick v. Phone

Directories Co., Inc.*, 397 F.3d 1256 (10th Cir. 2005), and other similar decisions, Luzenac argues

that Mr. Hertz cannot demonstrate that it took an action adverse to him.  It points out that Mr.

Hertz is now gainfully employed by a company called Valspar and is earning a salary greater than

the amount of his revenue from IMI Fabi's sales of Genera.  It asserts that no harm has resulted to

Mr. Hertz's future employment prospects; because Mr. Hertz has secured employment, Luzenac's conduct could not have made his securing of employment more difficult.  It goes so far as to assert the remarkable proposition that its "cease-and-desist letter caused [Mr. Hertz] to become employed."

Mr. Hertz will not be required at trial to demonstrate that Luzenac's actions precluded his employment with Valspar.  *Hillig v. Rumsfeld*, 381 F.3d 1028, 1035 (10th Cir. 2004).  A jury might rationally conclude that Luzenac's accusation, published to IMI Fabi, that Mr. Hertz misappropriated its trade secrets is the type of public denigration of Mr. Hertz's professional reputation that carries a "concomitant harm to future employment prospects." *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996); *Hillig*, 381 F.3d at 1035.  Indeed, some evidence appears that Mr. Hertz's professional reputation has suffered.  For example, since receiving Luzenac's counsel's cease-and-desist letter, IMI Fabi has insulated Mr. Hertz from its customers.

In any event, Mr. Hertz need not prove that he has suffered "a tangible injury" in order successfully to demonstrate that Luzenac took an action adverse to him.  *Hillig*, 381 F.3d at 1031.  The extent of harm to Mr. Hertz's future employment prospects is a question of damages, not of liability.  *Id*. at 1035.  *Accord*, *Washington v. Illinois Dept. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005); *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (regardless whether actual harm to employment relationship results, an action is adverse if it would dissuade a reasonable worker from making or supporting a charge of discrimination).

*Berry* is particularly instructive on this point.  In *Berry*, the defendants encouraged the prosecution of baseless, criminal charges against a former employee, who had since secured employment with another company, in retaliation for the former employees' filing of

37

discrimination charges with the EEOC.  The Tenth Circuit upheld a Title VII retaliation award for the former employee, holding that the adverse action need not be integrally connected with the employment relationship; "retaliatory prosecution can have an adverse impact on future employment opportunities and therefore can be an adverse employment action." *Berry*, 74 F.3d at 986.  Nowhere in the court's analysis of that case appears any concern over the claimant's actual employment status.  Instead, the court was interested in disparagement of the claimant's professional reputation.  *Id.*  Here,  Luzenac's August 5, 2003 letter accusing Mr. Hertz of misappropriation carries obvious connotations that Mr. Hertz is untrustworthy and can affect future employers' willingness to entrust to him their trade secrets.

This case does present a conceptual distinction from *Berry*.  Mr. Hertz has once already successfully pressed against Luzenac a claim for retaliation, which was premised upon his January, 1998 discharge from employment there.  He argues that the second allegedly adverse action, the sending of the August 5, 2003 cease-and-desist letter, constitutes retaliation for his successful litigation, in January, 2002, of his first retaliation claim.  What he alleges, in essence, is retaliation upon retaliation, or continuing retaliation borne out of Luzenac's putative inability to allow the January, 2002 verdict to be the final word on the circumstances of his separation from Luzenac. This would seem a stretch were it not for the striking abundance of evidence undermining the central element of Luzenac's misappropriation accusation, namely secrecy.  Like the criminal charges that the former employer pressed in *Berry*, Luzenac's accusation against Mr. Hertz wholly lacks merit.  *See*, *Berry*, 74 F.3d at 983-984.  A jury can reasonably conclude that the letter constituted a retaliatory, adverse action.

Also, as in *Berry*, the conclusion of the employment relationship and the subsequent lapse of time do not deprive the accusation of its adverse character for the purposes of Title VII. "It would be illogical to define... employee liberally to include former employees and to simultaneously define an adverse employment action narrowly by limiting it to those formal practices linked to an existing employee/employer relationship." *Berry*, 74 F.3d at 986.

As to causation, no reasonable juror can draw an inference from the proximity of the January, 2002 lawsuit to the July 31, 2003 email, the August 5, 2003 cease-and-desist letter, or the March 31, 2005 motion to amend alone. Luzenac threatened legal action against Mr. Hertz more than eighteen months after the jury verdict in Mr. Hertz's first lawsuit. And it filed its motion for leave to assert claims against Mr. Lighthart more than 38 months after Mr. Lighthart testified in Mr. Hertz's first lawsuit. *Compare*, *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (lapse of four months from protected conduct to adverse action insufficient, without other evidence, to give rise to inference of causation); *Stover v. Martinez*, 382 F.3d 1064, 1074 (10th Cir. 2004) (lapse of two years insufficient), *with*, *Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (one and one-half month delay sufficient to establish causation), *overruled on other grounds by Ellis v. University of Kansas Medical Center*, 163 F.3d 1186, 1194-1197 (10th Cir. 1998).

However, Mr. Hertz has produced other evidence relevant to causation. The record demonstrates with clarity that bad blood persisted between Mr. Hertz and Luzenac after the first lawsuit. Several Luzenac employees openly expressed their sense that Mr. Hertz's Title VII success was unjustly achieved. Granting Mr. Hertz every reasonable inference, a reasonable juror could conclude that IMI Fabi's success with Genera prompted the culmination of a months-long

retaliatory campaign against Mr. Hertz.  *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996).

This inference is bolstered by Luzenac's failure to take action against competitors other than IMI Fabi who sold products comparable to 604AV.  Luzenac argues that its decision to pursue legal recourse in this case was an exercise of business judgment; IMI Fabi met with success that other Luzenac competitors did not achieve.  A jury could rationally accept that legitimate, nondiscriminatory reason for Luzenac's actions.  However, the jury might also rationally determine that IMI Fabi was specially situated because of its affiliation with Mr. Hertz, against whom Luzenac sought satisfaction.  That Luzenac executives singled IMI Fabi out from among its competitors, that it continued to focus on Mr. Hertz nearly five years after his departure, that it had since relinquished its financial interests in 604AV to VHM, that it took a belated assignment of claims from VHM, and that its sales of material to VHM constituted paltry sums constitute "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Luzenac's proffered reasons such that "a reasonable factfinder could rationally find them unworthy of credence."  *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1136 (10th Cir. 2005).

Luzenac makes much of Mr. Hertz's testimony in deposition that he knew of no evidence of retaliation other than the baseless nature of Luzenac's trade secret claims.  Whatever the condition of Mr. Hertz's evidence at the time of his deposition, the record now contains evidence presenting an issue for the jury.

Mr. Ligthhart has produced no evidence of causation other than the 38-month period between his testimony on Mr. Hertz's behalf and his being included in this action.  Summary

judgment shall enter for Luzenac on Mr. Lighthart's retaliation claim.

Citing *Lambertsen v. Utah Dept. of Corrections*, 79 F.3d 1024 (10th Cir. 1996) and consistent decisions, Luzenac argues without specificity that "Title VII applies only to employees and does not protect independent contractor relationships." It reasons that, because SHA was an independent contractor of IMI Fabi and Mr. Hertz was not IMI Fabi's employee, Mr. Hertz cannot state a claim against Luzenac. It does not explain the relevance of Mr. Hertz's relationship with IMI Fabi. Nor does it dispute that Mr. Hertz was formerly its employee. It does not argue that actions taken after the termination of employment cannot constitute predicate acts.

Finally, Luzenac argues that the filing of a counterclaim can under no circumstances constitute retaliatory conduct. I need not resolve that question. Luzenac does not dispute that its email to IMI Fabi and its letter to Mr. Hertz, copied to IMI Fabi, served the purpose for which it sent them. It disputes that it can be held responsible for the email, which, it claims, originated from a distinct corporate entity. I have before me no evidence concerning the corporate structure of Luzenac or the relationships among its affiliates. Once again, I note that Luzenac designated pursuant to Fed. R. Civ. P. 30(b)(6) a witness ostensibly knowledgeable on these topics, who was unable in deposition to shed any light on the matter. Factual disputes resulting from Luzenac's confusion concerning its corporate relationships can be resolved at trial.

### C.    Interference claims

Under Colorado law,

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Trimble v. City and County of Denver*, 697 P.2d 716, 726 (Colo. 1985) (quoting Restatement (Second) of Torts § 766 (1979)).

Luzenac points out that IMI Fabi was not contractually bound to Mr. Hertz to sell any particular amount of Genera.  It argues that it cannot have interfered in the contractual relationship between IMI Fabi and Mr. Hertz or the relationship between Mr. Hertz and Mr. Lighthart because neither contract has been breached; no evidence appears that IMI Fabi has failed to pay commissions on the Genera it has sold and the consulting agreement requires IMI Fabi to sell no particular quantity.

Mr. Hertz responds that IMI Fabi has breached its implied obligation to make good-faith efforts to sell Genera and has, therefore, failed to fulfill his expectations.  To be sure, the consulting agreement between IMI Fabi and SHA, governed by West Virginia law, and the agreement between Mr. Hertz and Mr. Lighthart, subject to Colorado law, both contain implied covenants of good faith and fair dealing.  *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 499 (Colo. 1995); *Ashland Oil, Inc. v. Donahue*, 223 S.E.2d 433, 440 (W. Va. 1976).  The record, however, is devoid of evidence to suggest that IMI Fabi or Mr. Hertz has breached any such covenant. First, neither agreement discloses any expectation that the parties might have entertained about the quantities of sales of Genera.  Second, IMI Fabi was not contractually bound to sell any Genera at all.  Third, and most significant, nothing in the record indicates that IMI Fabi or Mr. Hertz reduced their efforts to sell Genera after receiving Luzenac's communications.

Nor have Messrs. Hertz and Lighthart produced evidence that Luzenac by its alleged interference prevented the formation of a contract, and their claims for interference with prospective business relations fail.  A "protected relationship exists only if there is a reasonable

likelihood or probability that a contract would have resulted; there must be something beyond a mere hope." *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995), *reh'g denied*, (1995), *cert. denied*, 516 U.S. 810, 116 S. Ct. 58, 133 L. Ed. 2d 22 (1995).  Nothing beyond a mere hope appears in the record and summary judgment is for that reason appropriate.  *US West, Inc. v. Business Discount Plan, Inc.*, 196 F.R.D. 576, 594 (D. Colo. 2000).

Mr. Baker of IMI Fabi testified that IMI Fabi has relaxed its efforts to market certain unidentified products that Mr. Hertz proposed to it.  However, he also testified that the decision rested on factors other than Luzenac's communications; IMI Fabi was waiting to see how well Genera sold before investing in additional projects.  And he did not testify, in any event, that IMI Fabi intended to bind itself contractually to produce any treated talc products.  The record thus does not support a finding that Mr. Hertz enjoyed a reasonable probability of receiving additional economic benefits but for Luzenac's missives.  *Klein*, 44 F.3d at 1506.

### D.    Defamation claim

Luzenac correctly asserts that communications to interested persons are privileged and that IMI Fabi was interested in the substance of its accusations against Mr. Hertz.  *Dominguez v. Babcock*, 727 P.2d 362, 365-366 (Colo. 1986); *Thompson v. Public Service Co. of Colorado*, 800 P.2d 1299, 1306 (Colo. 1990).  As Mr. Hertz concedes, no defamation liability can attach unless Luzenac acted with actual malice, thereby ceding its qualified privilege.  *Dominguez*, 727 P.2d at 366; *Bithell v. Western Care Corp.*, 762 P.2d 708, 714 (Colo. Ct. App. 1988).  A fact question whether Luzenac acted with malice when it sent the August 5, 2003 letter exists here. *Bithell*, 762 P.2d at 714.

The Restatement, which the Colorado courts have adopted, *Dominguez*, 727 P.2d at 366, provides that the publisher of defamatory material abuses the privilege "if he (a) knows the matter to be false, or (b) acts in reckless disregard as to its truth or falsity." Restatement (Second) of Torts § 600 (1977). The comment explains, "Reckless disregard as to truth or falsity exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement." *Id*. comment b.

From the record before me, I cannot discern that Luzenac made efforts to ascertain the truth of its accusation, communicated in its August 5, 2003 letter to Mr. Hertz and IMI Fabi, that Mr. Hertz had misappropriated Luzenac's trade secrets. One of the essential predicates of that imputation was that the information Mr. Hertz shared with IMI Fabi was confidential. The record is devoid of evidence that Luzenac, before accusing Mr. Hertz of misappropriation, undertook to ascertain whether it had any secret information capable of misappropriation. Luzenac's representatives demonstrated in their depositions an ignorance of the numerous disclosures concerning Mistron 604AV that Luzenac and its agents made in furtherance of their efforts to develop and market the product. Similarly, a modicum of due diligence would have revealed to Luzenac that VHM makes disclosures concerning the ingredients and pricing of VHM 604AV. The jury must determine whether Luzenac's ignorance was willful; whether Luzenac's decision-makers entertained serious doubts as to the secrecy of the information is a fact question.

Luzenac argues that, because it believed, and continues to believe, that the statements

contained in the email and letter are true, it cannot have acted with malice in publishing the documents to IMI Fabi. However, the question is whether Luzenac recklessly clung to its belief in spite of contrary evidence.

Accordingly, it is ORDERED that:

1) Luzenac's motion for summary judgment is GRANTED in part and DENIED in part;

2) Messrs. Hertz's and Lighthart's motion for summary judgment is GRANTED in part and DENIED in part;

3) judgment shall enter in Mr. Lighthart's favor on all of Luzenac's claims against him, with costs;

4) judgment shall enter in Luzenac's favor on all of Mr. Lighthart's claims against it, with costs;

5) Luzenac's claims against Mr. Hertz for conversion, civil theft, and intentional interference with prospective business relations will proceed to trial;

6) Mr. Hertz's claims for retaliation in violation of Title VII and defamation will proceed to trial; and

7) all other claims between Mr. Hertz and Luzenac are dismissed.

Dated: April __17__, 2006, in Denver, Colorado.

BY THE COURT:


__s/Lewis T. Babcock_____
Lewis T. Babcock, Chief Judge

45